UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

AIG PROPERTY CASUALTY COMPANY,          *
                                         *
                Plaintiff,               *
                                         *
        v.                               *
                                         *       Civil Action No. 22-cv-11401-ADB
LEE ROSENTHAL and RYAN DENVER,           *
                                         *
                Defendants.              *
                                         *
                                         *

**<u>MEMORANDUM AND ORDER</u>**

BURROUGHS, D.J.

This insurance coverage dispute arises out of a boating accident that took place on July 17, 2021 (the "Incident"), when Defendant Ryan Denver ("Denver") was allegedly navigating his boat, and struck a fixed navigational aid, resulting in several passengers entering the water, and one drowning.  [ECF No. 23 ¶¶ 3–4 ("Defendant Statement of Facts" or "DSOF"); ECF No. 24 ¶¶ 9–11, 21 ("Plaintiff Statement of Facts" or "PSOF")].  Defendant Lee Rosenthal ("Rosenthal," and along with Denver, "Defendants") was allegedly operating his own vessel nearby at the time of the Incident, [DSOF ¶ 7; PSOF ¶¶ 12–13], and navigated toward the scene, [DSOF ¶ 7; PSOF ¶¶ 12–13], but did not provide assistance, [DSOF ¶ 8; PSOF ¶ 18].

In this case, Plaintiff AIG Property Casualty Company ("AIG") seeks a declaratory judgment that it "is not obligated to defend and/or indemnify Rosenthal in connection with [separate] claims asserted by" Denver.  [ECF No. 1 at 1, ¶¶ 37–53 ("Complaint" or "Compl.")].  Pending before the Court are Rosenthal's motion for summary judgment based on his claim that AIG owes a duty to defend him against separate claims brought by Denver, [ECF No. 15], and AIG's cross-motion for summary judgment asserting that Rosenthal is not entitled to coverage,

[ECF No. 21].   For the reasons set forth below, Rosenthal's motion, [ECF No. 15], is <u>DENIED</u>, and AIG's cross-motion, [ECF No. 21], is <u>GRANTED</u> because the Court finds that Rosenthal breached the terms of his insurance policy with AIG by failing to sit for an examination under oath.  In addition, Denver's requests that Rosenthal be allowed to cure and for additional discovery, <u>see</u> [ECF No. 28 at 2 nn.2, 3],[1] are <u>DENIED</u>.

## I.    BACKGROUND

### A.    Background Facts

Except as otherwise noted, the following facts are not in dispute.[2]

---

[1] Denver requests that if the Court is inclined to grant summary judgment in favor of AIG, Rosenthal be allowed to cure any breach of his insurance policy and/or Denver be allowed to depose AIG.  <u>See</u> [ECF No. 28 at 2 nn.2, 3].

[2] The Court draws the facts from the parties' combined Rule 56.1 statement of material facts, which is AIG's Response to Rosenthal's Statement of Material Facts.  [Defendant Statement of Facts].  In addition, AIG filed a Rule 56.1 statement of material facts in support of its cross-motion for summary judgment, [Plaintiff Statement of Facts], to which Defendants did not respond.  Local Rule 56.1 states that

> [m]otions for summary judgment shall include a concise statement of the material facts of record as to which the moving party contends there is no genuine issue to be tried, with page references to affidavits, depositions and other documentation. . . . A party opposing the motion shall include a concise statement of the material facts of record as to which it is contended that there exists a genuine issue to be tried, with page references to affidavits, depositions and other documentation. . . . Material facts of record set forth in the statement required to be served by the moving party will be deemed for purposes of the motion to be admitted by opposing parties unless controverted by the statement required to be served by opposing parties. . . .

L.R. 56.1.  Accordingly, to the extent that they are not directly contradicted by the DSOF, facts set forth in AIG's PSOF are deemed admitted for purposes of this motion.  <u>Summers v. City of Fitchburg</u>, 940 F.3d 133, 138 (1st Cir. 2019).

     1.    <u>The Denver Action</u>

On November 12, 2021, Denver filed a claim with this Court for Exoneration from or Limitation of Liability with respect to the Incident.  [DSOF ¶ 1]; <u>In re Ryan Denver as Owner of M/V Make It Go Away</u>, No. 21-cv-11841, ECF No.1 (D. Mass. Nov. 12, 2021) (the "Denver Action").  On January 3, 2022, Denver filed a third-party complaint against Rosenthal in the Denver Action, which alleges that Rosenthal had a duty to render aid and that he breached that duty, [DSOF ¶¶ 2, 10; PSOF ¶ 8]; <u>In Re Denver</u>, No. 21-cv-11841 (D. Mass. Jan. 3, 2022), ECF No. 19 ("Third-Party Complaint"), and accordingly seeks contribution and indemnity for any liability that Denver has to the claimants in that case, <u>see</u> Third-Party Complaint ¶¶ 54–83.  The following are allegations from the Third-Party Complaint that are relevant to the instant dispute.

"[A]t 2:47 a.m. on July 17, 2021, [Denver] was navigating his boat, the M/V MAKE IT GO AWAY, in Boston Harbor when it allided with a fixed navigational aid (Daymarker No. 5) [(the "Daymarker")] in the vicinity of Castle Island."  [DSOF ¶ 3]; <u>see also</u> [PSOF ¶¶ 9–10].  "[T]he boat began taking on water, and [he] and his seven passengers entered the water."  [DSOF ¶ 4]; <u>see also</u> [PSOF ¶ 11].

Rosenthal, Denver alleges, was "operating a vessel navigating near [the] Daymarker" around the same time, [DSOF ¶ 5]; <u>see also</u> [PSOF ¶ 12], and he "and his passengers heard a broadcast over the radio . . . notif[ying them] . . . that people were in the water near [the] Daymarker."  [DSOF ¶ 6 (quoting Third-Party Complaint ¶ 19)]; <u>see also</u> [PSOF ¶ 13].  "[A]fter Rosenthal and his passengers heard the broadcast and requests for assistance . . . , [he] navigated his vessel towards [the] Daymarker."  [DSOF ¶ 7 (quoting Third-Party Complaint ¶ 25)].  The radio broadcast had directed them to assist the people in the water, and a spotlight was directed toward the scene "so Rosenthal and his passengers could render aid."  [PSOF ¶ 14 (quoting Third-Party Complaint ¶ 22)].  When he arrived, Rosenthal completed "'at least one circle, in

close proximity, around [the] Daymarker.'"  [DSOF ¶ 7 (quoting Third-Party Complaint ¶ 25)];
see also [PSOF ¶ 15].

Thereafter, "Rosenthal and his vessel was positioning to provide assistance to the eight
(8) people in the water, such that Denver and others began moving towards Rosenthal's vessel in
belief and reliance that aid was to be provided."  [PSOF ¶ 16 (quoting Third-Party Complaint
¶ 26)].  "[A]s Denver got within feet of Rosenthal's vessel, Rosenthal and his passengers heard
Denver ask Rosenthal and his passengers [to] help Denver's friend, Jeanica Julce, who was in the
water nearby." [Id. ¶ 17 (quoting Third-Party Complaint ¶ 30)].

"[A]t this point, without notice, Rosenthal's vessel departed the scene at a high rate of
speed and failed to provide any assistance to Denver and the seven (7) passengers, who were
either in the water, or holding on to the wreckage, or [the] Daymarker."  [PSOF ¶ 18 (quoting
Third-Party Complaint ¶ 31)].  Another ship's "[c]aptain called Rosenthal again as he departed,
stressing that there were people in the water and requesting him to render assistance in efforts to
prevent Rosenthal from departing the scene, but Rosenthal continued to operate his vessel away
from the scene."  [Id. ¶ 19 (quoting Third-Party Complaint ¶ 33)].  The Third-Party Complaint
alleges that "Rosenthal consciously chose not to assist or render aid to the people in the water,"
[id. ¶ 20 (quoting Third-Party Complaint ¶ 42)], and that sometime after he left, "Jeanica Julce
died by drowning," [id. ¶ 21 (quoting Third-Party Complaint ¶ 45)].

Despite having left the scene, a passenger on Rosenthal's boat called 911 "to report
people in the water."  [DSOF ¶ 9.  The passenger also told the 911 operator "that Rosenthal and
his passengers could see that search and rescue/law enforcement was on the way out to the scene
of the accident because they could see blue lights in the distance."  [Id.].

2.      <u>State Criminal Proceeding Against Denver</u>

In a separate state criminal proceeding against Denver regarding the Incident, his attorney, Liam O'Connell, filed an affidavit that apparently summarizes an investigative report regarding the Incident (the "O'Connell Affidavit").  [DSOF ¶¶ 12–14].  In his affidavit, he states that the investigation found that a witness supposedly on Rosenthal's boat "observed a man in the water . . . who told those on the boat to help his friend."  [DSOF ¶ 14; ECF No. 17-2 at 3].  The affidavit also says that Rosenthal had "heard traffic on his marine radio indicating the Coast Guard was en-route," [DSOF ¶ 14; ECF No. 17-2 at 3], and that according to the investigation report, Rosenthal then "transited away from the area to not interfere."  [DSOF ¶¶ 13–14; ECF No. 17-2 at 3].  Finally, according to the affidavit the investigator "notes that he obtained a certain video that shows a vessel appearing at 2:58 am, and leaving the area at 3:02 am, while the first rescue boat does not appear in frame until 3:10 am."  [ECF No. 17-2 at 3].  This affidavit was known and provided to AIG.  [DSOF ¶ 16].

3.      <u>Rosenthal's Policy with AIG</u>

AIG issued Rosenthal a Massachusetts Homeowners policy with a coverage period from July 15, 2021 to July 15, 2022.  [DSOF ¶ 17; ECF No. 17-3 at 2 (the "Policy")].  There are several provisions in the Policy that are relevant here.

First, the preamble to the Policy states

The insurance company named on your Declarations Page will provide the insurance described in this policy. . . . Various provisions in this policy restrict or exclude coverage.  Read the entire policy carefully to determine your rights and duties, and what is and is not covered.  We have no duty to provide coverage unless there has been full compliance with policy PART IV – CONDITIONS.

[Policy at 6][3]; see also [PSOF ¶ 2].

---

[3] Emphasis in the Policy is removed throughout unless otherwise noted.

Second, "PART I – DEFINITIONS" defines "Occurrence" as

a.  A loss or an accident, to which this insurance applies, including continuous or repeated exposure to substantially the same general harmful conditions, which occurs during the Policy Period and results in personal injury or property damage; or

b.  An offense, to which this insurance applies, including a series of related offenses, committed during the Policy Period that results in personal injury or property damage.

[Policy at 6]; see also [DSOF ¶ 20].  It further defines "Personal Injury" as "bodily injury" or

"death," and does not limit either the bodily injury or death to the insured person.  [Policy at 7].

Third, "PART III – LIABILTIY" states, among other things, the following:

A.  Insuring Agreement[.]  We will pay damages an insured person is legally obligated to pay for personal injury or property damage caused by an occurrence covered by this policy anywhere in the world, unless stated otherwise or an exclusion applies. . . .

C.   Defense Coverage and Claim Expense[.]  We will pay the costs to defend an insured person against any suit seeking covered damages for personal injury or property damage, even if the suit is false, fraudulent or groundless.  You may choose counsel from a panel of firms selected by us.  If a panel counsel is not established in the jurisdiction where the suit is brought, we reserve the right to select counsel.

We may investigate and settle any claim or suit at our discretion.  . . .

[Policy at 14]; see also [DSOF ¶ 19].

"PART III – LIABILTIY" then contains "Exclusions."  [Policy at 15].  Specifically, the

Policy states that it "does not provide coverage for liability, defense costs or any other cost or

expense for," among other things,

3.  Watercraft[.]  Personal injury or property damage arising out of the ownership, maintenance, use, operation, loading or unloading of any watercraft: a. That is twenty-six (26) feet or more in length or fifty (50) or more horsepower and which is owned by an insured person or furnished or rented to an insured person for longer than thirty (30) days; . . . [or]

17.  Intentional Acts[.]  Personal injury or property damage resulting from any criminal, willful, intentional or malicious act or omission by any person.  We also

will not cover claims for acts or omissions of any person which are intended to result in, or would be expected by a reasonable person to cause, property damage or personal injury.  This exclusion applies even if the injury or damage is of a different kind or degree, or is sustained by a different person, than expected or intended.  This exclusion does not apply to bodily injury if the insured person acted with reasonable force to protect any person or property.   [("Intentional Acts Exclusion")].

[Policy at 15–16]; see also [DSOF ¶ 21; PSOF ¶ 4].

Finally, the Policy includes "PART IV – CONDITIONS," which, as explained above, the insured must comply with to receive coverage under the Policy.  [Policy at 16–19].  The conditions provide that "[i]n the event of an occurrence which is likely to involve this policy, or if you or any other insured person under this policy is sued in connection with an occurrence which may be covered under this policy, you or an insured person must: 1. Give prompt notice to us or your agent or broker," [Policy at 16], and

6. We may reasonably require you to: a. Exhibit the damaged property; b. Provide us with records and documents pertinent to the loss and permit us to make copies; and c. Submit to an examination under oath, while not in the presence of another insured person, and sign the same. [("Condition 6")].

[Policy at 20–21].[4]

4.   Post-Incident Events

On February 16, 2022, approximately seven months after the Incident and one month after the Third-Party Complaint was filed in the Denver Action, [DSOF ¶¶ 1–2, 10; PSOF ¶ 8], AIG sent a letter to Rosenthal regarding coverage, [DSOF ¶ 23; PSOF ¶ 26].  It stated that "[t]he purpose of this letter is to advise you of AIG's preliminary coverage position for the Denver Action, which is subject to the reservation of rights set out herein, and to request additional information from you."  [ECF No. 17-4 at 2 (emphasis removed)].  It goes on to say, among

---

[4] The Policy contains a "Homeowners Amendatory Endorsement" for Massachusetts, which includes the operative Condition 6 cited above.  [Policy at 20–24]; see also [PSOF ¶ 6].

other things, that "[t]he Denver Action could only possibly implicate PART III – LIABILITY of the Policy which provides $500,000 in liability limits.  Accordingly, our analysis is limited to PART III – LIABILITY."  [Id. at 3–4 (emphasis removed)].  It then lists "Pertinent Policy Language," including the "Insuring Agreement" and "Defense Coverage and Claim Expenses" portion of Part III, as well as the definition of "occurrence."  [Id. at 4].

The letter also states AIG's "Coverage Position" that, among other things, with respect to "Exclusion 3[,] Watercraft . . . [o]ur understanding is that the watercraft you were operating during the events described in the Denver Action was a thirty-one-foot" vessel, with "two separate two-hundred and fifty horsepower engines.  As such, the watercraft exceeds the criteria set forth in subparagraph a. of Exclusion 3. . . . Accordingly, AIG must reserve its rights to limit or deny coverage for the Denver Action based on Exclusion 3a. and 3c."  [ECF No. 17-4 at 5 (emphasis removed)].

Further, the letter provides that the allegations in the Denver Action "would appear to trigger Exclusion 17[] as they allege personal injury resulting from a willful and intentional omission on your part.  As such, AIG must reserve its right to limit or deny coverage for any liability on your part based on your alleged actions and Exclusion 17."  [ECF No. 17-4 at 6].

The letter also points to Part IV, Condition B, "Your Duties After a Loss," and requests that Rosenthal provide AIG with several documents and information.  [ECF No. 17-4 at 7–9; see also [DSOF ¶ 25].  Despite AIG's assertion to the contrary, [DSOF ¶ 24], the letter does not appear to have specifically requested an interview of Rosenthal.  See [ECF No. 17-4].

Finally, the letter states the "conclusion" that "AIG acknowledges the potential for coverage relative to the Denver Action subject to the reservation of rights set forth in this letter and its ongoing investigation."  [ECF No. 17-4 at 8 (emphasis removed)].  It further provides that

the "letter is not, and should not be construed as, a waiver of any terms, conditions, exclusions, or other provisions of the Policy" and that "AIG expressly reserves all of its rights under the Policy, including the right to assert additional defenses . . . or deny coverage if subsequent developments or information indicates that such action is warranted."  [Id.].

After this initial letter, between February 24, 2022 and March 29, 2022, the parties exchanged correspondence in which Rosenthal's counsel asserted that AIG was obligated to pay Rosenthal's defense costs, [PSOF ¶ 29], AIG reiterated requests for documents and information, [id. ¶ 30], and Rosenthal's counsel responded to some of AIG's requests and indicated that more documents were on the way, [id. ¶ 31].[5]

About two months later, on May 24, 2022, AIG requested an examination under oath ("EUO") of Rosenthal.  [DSOF ¶ 27; PSOF ¶ 32].  Rosenthal states, and AIG disputes, that "AIG demanded" the EUO "without any basis . . . even though such an examination by AIG would serve no legitimate purpose and would interfere with Mr. Rosenthal's rights and be inconsistent with his litigation strategy in the underlying case."  [DSOF ¶ 27].

The parties also dispute whether an EUO was required under the Policy.  [DSOF ¶ 28]. For example, on June 9, 2022, Rosenthal's counsel responded to the EUO request, stating, among other things, that they disagreed that the Policy required an EUO, arguing the following:

> Condition 6. "as often as we reasonably require: a. Show us the damaged property; b. Provide us with records and documents we request; and c. Submit to separate examination under oath." This condition relates only to "damaged property" as described in D. Additional Coverages 1. Damaged Property for situations in which an insured person destroys or damages other people's property.  In such situations, Condition 6 may require an insured to "[s]ubmit to separate examination under oath."

---

[5] Rosenthal states that he "promptly complied with [AIG's] request[s] in a series of emails and correspondence," but AIG agrees only that "Mr. Rosenthal complied with certain of AIG's requests."  [DSOF ¶ 26].

[PSOF ¶ 34; ECF No. 22-10 at 3].  Rosenthal further states, and AIG disputes, that "the examination under oath is applicable only to first-party claims under the Policy, not to third-party claims like those asserted in the Third-Party Complaint."  [DSOF ¶ 29].

Ultimately, on June 22, 2022, AIG wrote Rosenthal stating that "the AIG Policy does require that Mr. Rosenthal submit to an examination under oath ('EUO') and his refusal to do so would constitute a breach of his duty to cooperate, both under the AIG Policy and at law," [ECF No. 17-8 at 2], and also that "if Mr. Rosenthal refuses to submit to an EUO, AIG will be stymied in its ability to either confirm or deny coverage.  Thus, it will have sufficient grounds to deny coverage to him for the Denver Action."  [Id. at 5]; see also [DSOF ¶ 30 (emphasis removed)].  AIG also sent a similar letter on August 1, 2022, saying that "[i]t ha[d] been over a month since the [June 22] letter was sent to [Rosenthal], and [it] ha[d] not received any response as to Mr. Rosenthal's willingness to submit to an EUO or his availability."  [ECF No. 17-9 at 2]; see also [DSOF ¶ 30].

On August 15, 2022, Rosenthal's counsel responded, stating that "'we believe the position presented in our letter of June 9, 2022, which is incorporated by reference, construes the AIG policy according to the fair meaning of the language used.  The position presented in your letter is simply flawed.'"  [PSOF ¶ 37 (quoting ECF No. 22-13 at 2)].

B.    **Procedural Posture**

On August 31, 2022, AIG filed its Complaint seeking a declaratory judgment that it is not obligated to cover Rosenthal under the Policy because he (1) had a duty to submit to an examination under oath, (Count I), (2) failed to do so and thus breached his duty to cooperate, (Count II), and (3) that in any event, coverage for the Denver Action is precluded by the Policy's Intentional Acts Exclusion, (Count III).  [Compl. ¶¶ 37–53].  Rosenthal moved for summary

judgment on March 1, 2023, [ECF No. 15], which Denver joined with respect to AIG's alleged duty to defend Rosenthal for claims brought by Denver, [ECF No. 25].  AIG opposed on March 24, 2023, [ECF No. 20].[6]

AIG filed its cross-motion for summary judgment on March 24, 2023.  [ECF No. 21]. Rosenthal opposed on April 14, 2023, [ECF No. 27], Denver filed a third-party opposition on April 17, 2023, [ECF No. 28], and AIG replied on April 24, 2023, [ECF No. 29].

## II.      STANDARD OF REVIEW

Summary judgment is appropriate where the movant demonstrates that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  "A fact is material if its resolution might affect the outcome of the case under the controlling law."  Cochran v. Quest Software, Inc., 328 F.3d 1, 6 (1st Cir. 2003). "A genuine issue exists as to such a fact if there is evidence from which a reasonable trier could decide the fact either way."  Id.  When reviewing the record, the court "must take the evidence in the light most flattering to the party opposing summary judgment, indulging all reasonable inferences in that party's favor."  Id.  The First Circuit has noted that "[t]his standard is favorable to the nonmoving party, but it does not give him a free pass to trial."  Hannon v. Beard, 645 F.3d 45, 48 (1st Cir. 2011).  "The factual conflicts upon which he relies must be both genuine and material," Gomez v. Stop & Shop Supermarket Co., 670 F.3d 395, 397 (1st Cir. 2012), and the court may discount "conclusory allegations, improbable inferences, and unsupported speculation," Cochran, 328 F.3d at 6 (quoting Medina-Muñoz v. R.J. Reynolds Tobacco Co., 896 F.2d 5, 8 (1st Cir. 1990)).

---

[6] AIG's opposition, [ECF No. 20], is also its memorandum in support of its cross-motion for summary judgment, [ECF No. 21].

"To succeed in showing that there is no genuine dispute of material fact, the moving party must [point] to specific evidence in the record that would be admissible at trial." Ocasio-Hernández v. Fortuño-Burset, 777 F.3d 1, 4 (1st Cir. 2015).  "That is, it must 'affirmatively produce evidence that negates an essential element of the non-moving party's claim,' or, using 'evidentiary materials already on file . . . demonstrate that the non-moving party will be unable to carry its burden of persuasion at trial.'"  Id. at 4–5 (quoting Carmona v. Toledo, 215 F.3d 124, 132 (1st Cir. 2000)).  "One of the principal purposes of the summary judgment rule is to isolate and dispose of factually unsupported claims or defenses . . . ." Celotex Corp. v. Catrett, 477 U.S. 317, 323–24 (1986).  Once the movant takes the position that the record fails to make out any trial-worthy question of material fact, "it is the burden of the nonmoving party to proffer facts sufficient to rebut the movant's assertions." Nansamba v. N. Shore Med. Ctr., Inc., 727 F.3d 33, 40 (1st Cir. 2013).

## III.      DISCUSSION

### A.      Examination Under Oath

The parties dispute whether Rosenthal was required to submit to an EUO under the Policy, and whether his failure to do so was a breach of the Policy.  See, e.g., [ECF No. 16 at 12–13; ECF No. 20 at 9–10].

"Under Massachusetts law, insurance-contract interpretations pose legal issues for resolution by the court, and, absent ambiguity, insurance contracts are to be enforced in accordance with their plain language." Utica Mutual Ins. Co. v. Weathermark Invs., Inc., 292 F.3d 77, 80 (1st Cir. 2002) (first citing Somerset Savs. Bank v. Chicago Title Ins. Co., 649 N.E.2d 1123, 1127 (Mass. 1995); and then citing Jacobs v. U.S. Fid. & Guar. Co., 627 N.E.2d 463, 464 (Mass. 1994)).  Moreover, "insurance policies should be construed as a whole without

according undue emphasis to any particular part over another." Id. (quoting Mission Ins. Co. v. U.S. Fire Ins. Co., 517 N.E.2d 463, 466 (Mass. 1988) (internal quotation marks and citation omitted)).  "Only where a contractual term is ambiguous does its interpretation pose a question of fact, and though the parties may adduce extrinsic evidence of their respective intendments, any residual ambiguity must be resolved against the insurer."  Id. (citing Preferred Mut. Ins. Co. v. Gamache, 686 N.E.2d 989, 991 (Mass. 1997)).

Here, the Preamble states that "[AIG] ha[s] no duty to provide coverage unless there has been full compliance with policy PART IV – CONDITIONS," [Policy at 6]; see also [PSOF ¶ 2]. In turn, PART IV – CONDITIONS states that "[i]n the event of an occurrence which is likely to involve this policy, or if you or any other insured person under this policy is sued in connection with an occurrence which may be covered under this policy, you or an insured person must: 1. Give prompt notice to us or your agent or broker . . . ," [Policy at 16],  and "6. [w]e may reasonably require you to: a. Exhibit the damaged property; b. Provide us with records and documents pertinent to the loss and permit us to make copies; and c. Submit to an examination under oath, while not in the presence of another insured person, and sign the same," [Policy at 20–21]; see also [PSOF ¶ 6].

AIG argues that Rosenthal's refusal to submit to AIG's request for an EUO "as part of its coverage investigation (including the extent of coverage available for 'Watercrafts,' as defined), constitutes a breach of his duty to cooperate under the [P]olicy."  [ECF No. 20 at 1–2, 9–10 (citing PSOF ¶ 6].

Rosenthal, on the other hand, responds first that "an insurer like AIG may not pretextually demand and use testimony obtained in an examination under oath to disclaim its duty to pay defense costs," as an "[a]n examination never could be used by AIG or considered by

a court in determining AIG's coverage obligations under the Policy," [ECF No. 16 at 12–13],

because the duty to defend is based on the "eight corners" of the Third-Party Complaint and the

terms of the Policy. [Id.].[7] Second, he avers that he was not required to sit for the EUO because

the EUO condition is a "stand-alone provision that[,] by its terms[,] applies only to the insured's

own damaged property claims." Id. at 13. Specifically, he argues that the "conjunction (and)" in

Condition 6 between parts b. and c., "fairly interpreted[,] permits an examination only in claims

involving insured damaged property and the records and documents concerning said property

(described in Condition 6. a and b.)." [Id.].[8]

---

[7] Rosenthal articulates the "eight corners" rule as follows:

> the duty to defend is based on the "eight corners" rule: the allegations in the Third-
> Party Complaint and the terms of the Policy. See Edwards v. Lexington Ins. Co.,
> 507 F.3d 35, 40–41 (1st Cir. 2007) ("Grounded in policy considerations, the so-
> called "eight corners rule" is appropriately invoked in the context of occurrence
> policies because the complaint in describing the incident will usually provide
> adequate information to determine whether—at least as alleged—the incident is
> within the scope of the insurance policy"). Any other information obtained or
> considered by AIG would be extrinsic to the "eight corners."

[ECF No. 16 at 12].

[8] Rosenthal cites to the language in the original policy, not the Massachusetts addendum, [ECF No. 16 at 13; Policy at 17, 20–21], but even if the parties dispute which provision is operative, it appears that Rosenthal's argument would remain substantively the same.

1.      Whether AIG Can Decline to Defend Based on an EUO Refusal

An insurer's duty to defend is triggered when the allegations of the complaint in the underlying action brought against the insured "are reasonably susceptible of an interpretation that they state or adumbrate a claim covered by the policy terms," Liberty Mut. Ins. Co. v. Metro. Life Ins. Co., 260 F.3d 54, 64 (1st Cir. 2001) (internal quotation and citation omitted), and an exclusion does not preclude coverage, Lionbridge Techs., LLC v. Valley Forge Ins. Co., 53 F.4th 711, 719 (1st Cir. 2022).

The insured initially bears the burden of showing, through general allegations, a "possibility that the liability claim [in the underlying complaint] falls within" coverage. Lionbridge Techs., 53 F.4th at 719. "The facts alleged need not 'specifically and unequivocally make out a claim within the coverage' but rather 'need only show, through general allegations, a possibility that the liability claim falls within the insurance coverage.'" Id. (quoting Billings v. Com. Ins. Co., 936 N.E.2d 408, 414 (Mass. 2010)). Moreover, the "analysis 'does not turn on the specific cause of action' stated in the underlying complaint, but rather 'focuses on "envisaging what kinds of losses may be proved as lying within the range of the allegations of the complaint, and then seeing whether any such loss fits the expectation of protective insurance reasonably generated by the terms of the policy."'" Id. (quoting Holyoke Mut. Ins. Co. v. Vibram USA, Inc., 106 N.E.3d 572, 577 (Mass. 2018)). "In other words, [the court] determine[s] whether the underlying complaint invokes coverage based on the 'source' of the injury 'rather than the specific theories of liability' advanced in the complaint." Id. (quoting Bagley v. Monticello Ins. Co., 720 N.E.2d 813, 817 (Mass. 1999)).

"[T]he duty to defend is based on the facts alleged in the complaint and those facts which are known by the insurer." Essex Ins. Co. v. BloomSouth Flooring Corp., 562 F.3d 399, 403 (1st Cir. 2009) (quoting Bos. Symphony Orchestra, Inc. v. Com. Union Ins. Co., 545 N.E.2d 1156,

15

1158–59 (Mass. 1989)).  "[I]nformation derived from outside the complaint may not serve to negate the duty to defend."  Id. (alteration in original) (quoting Metallized Prods. Inc. v. Travelers Ins. Co., No. MICV200203452, 2003 WL 22481398, at *3 (Mass. Super. Sept. 17, 2003)).  Thus, "the duty to defend is determined 'by comparing the allegations in the underlying complaint with the provisions of the insurance policy.  If a complaint reveals a potential . . . that the facts ultimately proved may come within the coverage, a duty to defend exists,'" Edwards, 507 F.3d at 40 (emphasis added) (first quoting Me. State Acad. of Hair Design, Inc. v. Com. Union Ins. Co., 699 A.2d 1153, 1156 (Me. 1997) (internal quotation marks and citations omitted) (alteration in original); and then citing Anderson v. Va. Sur. Co., 985 F. Supp. 182, 188 (D. Me. 1998)).

That said, an insurer's duty to defend is not without limits.  There is "no duty to defend a claim that is specifically excluded from coverage" where the insurer establishes the applicability of any exclusion.  Brazas Sporting Arms, Inc. v. Am. Empire Surplus Lines Ins. Co., 220 F.3d 1, 4 (1st Cir. 2000); see also Lionbridge Techs., 53 F.4th at 721 ("Regardless of [the court's] coverage conclusion, [the insurer] could still extinguish its obligation to defend by demonstrating that a Policy exclusion precludes coverage" (citing Scottsdale Ins. Co. v. Byrne, 913 F.3d 221, 228–29 (1st Cir. 2019))).[9]  The insurer "has the burden of demonstrating that an exclusion applies," and "must show 'the facts alleged in the third-party complaint . . . establish that the

---

[9] Although the EUO requirement in the Policy falls under "conditions," not "exclusions," the Court sees no discernable difference between the two as both the "conditions" and "exclusions" provide bars to coverage under the Policy.  See [Policy at 6 ("We have no duty to provide coverage unless there has been full compliance with policy PART IV – CONDITIONS"); Policy at 15 ("Exclusions[.]  This policy does not provide coverage for liability, defense costs, or any other cost or expense for: . . . ."); see also Edwards, 507 F.3d at 40 ("If a complaint reveals a potential . . . that the facts ultimately proved may come within the coverage, a duty to defend exists") (emphasis added).

exclusion applies to all potential liability as a matter of law." Lionbridge Techs., 53 F.4th at 721 (quoting Scottsdale Ins. Co., 913 F.3d at 228–29 (quoting Norfolk & Dedham Mut. Fire Ins. Co. v. Cleary Consultants, Inc., 958 N.E.2d 853, 862 (Mass. App. Ct. 2011)). "Like the initial coverage determination, whether an exclusion applies 'depend[s] on whether the insured would have reasonably understood the exclusion to bar coverage.'" Id. (quoting Essex Ins. Co., 562 F.3d at 404).

Moreover, "[u]nder Massachusetts law, attendance at reasonably requested EUOs is a condition precedent for insurance coverage." Philadelphia Indem. Ins. Co. v. BAS Holding Corp., 78 F.4th 53, 59 (1st Cir. 2023) (citing Mello v. Hingham Mut. Fire Ins. Co., 656 N.E.2d 1247, 1250 (Mass. 1995)). "An insurer thus may properly disclaim coverage when faced with a 'wilful [sic], unexcused refusal to submit to an examination under oath, without proof of actual prejudice.'" Id. (quoting Lorenzo-Martinez v. Safety Ins. Co., 790 N.E.2d 692, 695 (Mass. App. Ct. 2003)).

The key question here is whether Rosenthal's failure to sit for an EUO under Condition 6 discharged AIG's Policy obligations,[10] including the duty to defend. As an initial matter, even if AIG could not use the testimony from an EUO as a basis for declining coverage, if the failure to submit to an EUO itself precludes coverage under the Policy, then there is no duty to defend. See Biochemics, Inc. v. Axis Reinsurance Co., 963 F. Supp. 2d 64, 69–70 (D. Mass. 2013) ("an insurer *may* use extrinsic evidence to deny a duty to defend based on facts irrelevant to the merits of the underlying litigation, such as whether the claim was first made during the policy period, whether the insured party reported the claim to the insurer as required by the policy, or whether

---

[10] Rosenthal argues, and AIG appears to concede, that absent an exclusion or other bar to coverage under the Policy, the conduct here would fall under the Policy. See [ECF No. 16 at 10].

the underlying wrongful acts were related to prior wrongful acts") (emphasis in original).[11]  The

clear and unambiguous language of the Preamble and Condition 6 of the Policy provides that

AIG "ha[s] no duty to provide coverage unless," when "reasonably required[d]" to do so, the

insured "[s]ubmit[s] to an examination under oath." [Policy at 6, 16, 20–21].  Accordingly, under

either view of Condition 6—as an exclusion or a condition precedent—Rosenthal's failure to sit

for the EUO could relieve AIG of its duty to defend.  See Philadelphia Indem. Ins. Co., 78 F.4th

at 59; Lionbridge Techs., 53 F.4th at 721.

        2.      Whether the Policy Required Rosenthal to Sit for an EUO

Second, the Court finds that the Policy required Rosenthal to sit for an EUO upon

reasonable request by AIG.  Contrary to Rosenthal's argument that Condition 6 "stand[s] alone,"

[ECF No. 16 at 13], "[i]nsurance policies should be construed as a whole 'without according

undue emphasis to any particular part over another.'"  Utica Mutual Ins. Co., 292 F.3d at 80

(quoting Mission Ins. Co., 517 N.E.2d at 466).  Read plainly and as a whole, see id., the Policy

precludes coverage when, "[i]n the event of an occurrence which is likely to involve this policy,

or if you or any other insured person under this policy is sued in connection with an occurrence

which may be covered under this policy," the insured does not comply with Condition 6.  See

[Policy at 16].  Moreover, where the Policy as a whole explicitly covers "personal injury or

property damage," [Policy at 14 (emphasis added)], without any explicit limitation to first-party

or third-party claims, the Court finds that Condition 6 unambiguously states that AIG "may," in

---

[11] The Court disagrees with Rosenthal's assertion that the failure to sit for the EUO is not an
"undisputed extrinsic fact[] that take[s] the case outside the coverage and that will not be
litigated at trial of the underlying action."  [ECF No. 16 at 12 n.3 (quoting Billings, 936 N.E.2d
at 414 n.8)].  While the content of the EUO may be disputed and/or relevant to the allegations in
the Third-Party Complaint, the fact of whether he sat for an EUO with AIG is separate from
those issues.  Moreover, the Court agrees with AIG that, for example, whether Rosenthal's use of
his vessel places him within the watercraft exclusion of the Policy is not relevant to the
underlying action.  [ECF No. 20 at 14–15].

any situation that may result in coverage under the Policy, "reasonably require" the insured party to comply with any one of the requirements to "a. Exhibit the damaged property; b. Provide us with records and documents pertinent to the loss and permit us to make copies; and c. Submit to an examination under oath, while not in the presence of another insured person, and sign the same." [Policy at 20–21].[12]   This finding is consistent with other cases in which an EUO was required.  See Com. Ins. Co. v. Flores, No. 9800842, 2000 WL 782006, at *3–4 (Mass. Super. Ct. Mar. 30, 2000) (finding request for EUO "reasonable" despite that "the [topic covered] overlaps with an actual or potential third-party liability case," and also that the "failure to submit to an examination . . . [was] a material and substantial breach of the policy as a matter of law and excuse[d] [the insurer] from liability on the policy."); Barabin v. AIG Haw. Ins. Co., 921 P.2d 732, 737 (Haw. 1996) (finding policy unambiguously required the insured to submit to an EUO because "the policy clearly states that [the insurer] has 'no duty to provide any coverage under this policy unless there has been full compliance with the following duties: . . . [to] [s]ubmit, as often as [the insurer] reasonably require[s]: . . . to examination under oath[.]'  This language is clear and unambiguous and, by its own terms, applies to all coverages under the policy.'"); id. at

---

[12] Unlike Boston Retirement Board v. Contributory Retirement Appeal Board, where a statute stated that "[a]ny member who becomes totally and permanently incapacitated for further duty by reason of a personal injury sustained or a hazard undergone as a result of, **and** while in the performance of, his duties . . . shall be retired for accidental disability," 162 N.E.2d 821, 822 n.2, 823 (Mass. 1959) (quoting Mass. Gen. Laws Ch. 32, § 7 (cleaned up)), the "and" in the Policy here can only reasonably be interpreted as adding an additional item to the list that AIG "may reasonably require [the insured] to" do, not as creating a stand-alone, all-inclusive list for damaged property claims.

737 (citing cases with similar findings with respect to EUO provisions)[13].[14]  It is also consistent

with the policy described in <u>MetLife Auto & Home v. Cunningham</u>, where the Massachusetts

Appeals Court explained that

> [t]he insurer is entitled, irrespective of whether its duty is to defend or to indemnify, to gain as much knowledge and information as may aid it in its investigation, or as may otherwise be significant to the insurer in determining its liability under the policy and in protecting against fraudulent claims.  To hold otherwise effectively places the insurer at the mercy of the insured and severely handicaps it in contesting a claim.

797 N.E.2d 18, 23 (Mass. App. Ct. 2003) (quoting <u>Waste Mgmt., Inc. v. Int'l Surplus Lines Ins.</u>

<u>Co.</u>, 579 N.E.2d 322, 333 (Ill. 1991) (internal citation omitted)).

Finally, the request and its timing was reasonable.  "What is a reasonable time" to request

an EUO "is usually a question of fact, but if the facts are not in dispute, it is a question of law."

<u>Lorenzo-Martinez</u>, 790 N.E.2d at 696.  "Determining what is a reasonable amount of time

involves examining 'the nature of the contract, the probable intention of the parties, and the

---

[13] The Court rejected the argument that

> the EUO provision is ambiguous because the EUO provision is located outside the section of the policy dealing with no-fault coverage. . . .  The general provisions appear in part G of the policy.  [The insured] therefore contends that, because the EUO requirement appears in part F of the policy, which is entitled "Duties After an Accident or Loss" and which is not expressly incorporated into part E of the policy dealing with no-fault coverage, the policy is ambiguous regarding the effect of the EUO provision and cannot serve as the basis for precluding no-fault coverage.

<u>Barabin</u>, 921 P.2d at 737.

[14] Rosenthal's apparent argument that Condition 6 is limited to first-party claims because its wording is similar to the language in Mass. Gen. Laws Ch. 175, § 99 is unavailing.  <u>See</u> [ECF No. 16 at 15–16].  By Rosenthal's own admission, § 99 relates to the "Standard Form And Content Of Policies Or Contracts Insuring Against Loss Or Damage By Fire Or Fire And Lightning," [<u>id.</u> at 15], which is not what the Policy here is directed to.  As explained above, the Court construes the Policy here as a whole, <u>Utica Mutual Ins. Co.</u>, 292 F.3d at 80, and not based on similarities to any separate and unrelated policies.

attendant circumstances.'" Id. (quoting Plymouth Port, Inc. v. Smith, 530 N.E.2d 194, 196 (Mass. App. Ct. 1988)).

In Lorenzo, where two individuals refused to sit for an EUO regarding claims for a car accident, 790 N.E.2d at 693–94, the Massachusetts Appeals Court affirmed summary judgment in favor of one insurer with respect to one individual, and reversed summary judgment in favor of a separate insurer for the other individual. Id. at 698. With respect to the insurer that the court found reasonably requested an EUO, the request was made nine months after the insured's claim for coverage, during which the insured had failed to respond to several requests for information. Id. at 696–97. For the claim that went against the other insurer, it had waited thirteen months after the initial claim to request an EUO, and "nothing on the record . . . indicate[d] that [the insurer] did anything to investigate the claim until after [the insured] had initiated [legal] action." Id. at 697.

Here, the Third-Party Complaint was filed on January 3, 2022, [DSOF ¶¶ 2, 10; PSOF ¶ 8]; AIG sent its initial reservation of rights approximately one month later on February 16, 2022, [DSOF ¶ 23; PSOF ¶ 26]; requested an EUO approximately three months later on May 24, 2022, after having received some but not all responses to its requests for information, [PSOF ¶¶ 29–32]; requested an EUO again on June 22, 2022 and August 1, 2022, at which time it told Rosenthal that his failure to respond would be "construe[d] . . . as a refusal to submit to an EUO which will continue to hinder AIG in its ability to either confirm or deny coverage," [id. ¶¶ 35–36]; and Rosenthal ultimately refused the EUO on August 15, 2022, [id. ¶ 37]. Under these circumstances, it was reasonable to request an EUO within five months of the claim after having requested information and received some, but not all, of what was requested. See Lorenzo, 790

N.E.2d at 696–97.  Accordingly, the Court finds that AIG reasonably requested an EUO and that Rosenthal was required to sit for one.

        3.     <u>Waiver and Prejudice</u>

Rosenthal next argues that even if he were required to sit for an EUO, there was no breach because there is no prejudice where AIG has "waived or relinquished . . . [and] refused to conduct or fund [a defense]" in light of its reservation of rights letter.  [ECF No. 16 at 17].

AIG responds that it need not show prejudice in order to deny coverage for Rosenthal's failure to submit to the EUO, and that even if it did, it was clearly prejudiced.  [ECF No. 20 at 15–16].  Specifically, AIG argues that it was prejudiced by the refusal because it was unable to learn more information about the vessel Rosenthal was operating during the Incident, and thus whether coverage is precluded by the watercraft exclusion.  [<u>Id.</u> at 16].

As an initial matter, contrary to Rosenthal's suggestion, AIG's reservation of rights did not necessarily waive or relinquish any duty to defend.  <u>See</u> <u>Biochemics, Inc.</u>, 963 F. Supp. 2d at 71 (finding that (1) "[w]hen there is a legitimate dispute about an insurer's duty to defend, the insurer will often provide a defense under a reservation of rights," (2) that the court was aware of "no Massachusetts law requiring an insurer to defend the insured pending resolution of coverage issues," and (3) "Massachusetts apparently permits an insurer to refuse to defend its insured; the insurer simply risks liability for the defense costs that the insured party incurs (which may be higher than if the insurer had provided a defense)." (internal citations omitted)); <u>Narragansett Bay Ins. Co. v. Kaplan</u>, 146 F. Supp. 3d 364, 374 (D. Mass. 2015) ("The reservation of rights, followed by orderly recourse to a declaratory judgment action for the judicial determination of the duty to defend, is a standard and prudent practice in the insurance industry, as recognized in the case law.").

In addition, "[i]t is the law in most jurisdictions that the submission to an examination, if the request is reasonable, is strictly construed as a condition precedent to the insurer's liability," and the Massachusetts Supreme Judicial Court has "agree[d] with these authorities." Mello, 656 N.E.2d at 1250.[15]  Thus, "[a]n insured's willful [sic], unexcused refusal to comply with a reasonable request for an examination under oath, . . . constitutes a material breach of a condition precedent to the insurance contract and discharges the insurer's obligations thereunder.  The insurer need not show prejudice in such circumstances." Hanover Ins. Co. v. Cape Cod Custom Home Theater, Inc., 891 N.E.2d 703, 707 (Mass. App. Ct. 2008).[16]

---

[15] Rosenthal cites Romano v. Arbella Mutual Insurance Co., 429 F. Supp. 2d. 202 (D. Mass. 2006) for the proposition that "[a]n insured's putative '[f]ailure to cooperate is grounds for denial of coverage only if the insurer makes "an affirmative showing of actual prejudice resulting from" the failure.'" [ECF No. 16 at 17 (quoting Romano, 429 F. Supp. 2d at 208)].  Romano, however, addressed a failure to produce documents, not to sit for an EUO, and also cited to MetLife and Darcy v. Hartford Insurance Co., 554 N.E.2d 28, 34 (Mass. 1990) for the purported law on prejudice.  See Romano, 429 F. Supp. 2d at 208; see also Metlife, 797 N.E.2d at 23–24 (also relying on Darcy for prejudice requirement).  Darcy, in turn, cites to Johnson Controls, Inc. v. Bowes, 409 N.E.2d 185 (Mass. 1980) for the prejudice requirement.  Darcy, 554 N.E.2d at 31, 33.

More than five years after Darcy, the Massachusetts Supreme Judicial Court in Mello held that its "decision in Johnson Controls . . . affected only the notice provisions of the G.L. c. 175, § 99's duty to cooperate," and went on to hold that it "agree[d] with" "the law in most jurisdictions that the submission to an examination, if the request is reasonable, is strictly construed as a condition precedent to the insurer's liability." Mello, 656 N.E.2d at 1249–50; see also David v. Hingham Mut. Fire Ins. Co., No. 07-cv-10328, 2007 WL 4322792, at *4 (D. Mass. Dec. 7, 2007) ("Massachusetts courts have not applied the Johnson Controls prejudice requirement when an insured has failed to comply with a condition precedent, such as submission to an examination under oath").

[16] Rosenthal cites Hanover for the proposition that "an insurer may not disclaim coverage by virtue of an insured's breach of its duty to cooperate absent a showing of prejudice." [ECF No. 16 at 17 (quoting Hanover, 891 N.E.2d at 707 (citing Boffoli v. Premier Ins. Co., 880 N.E.2d 826, 829 (Mass. App. Ct. 2008)))].  The court in Hanover explained, however, that Boffoli "went on to underscore . . . the significance of the examination under oath.  [Specifically that,] 'because of the importance of weeding out fraud . . . we have recognized a limited exception to the prejudice requirement in those cases where there was a willful and unexcused refusal of the

As discussed above, the request for an EUO here was reasonable, and Rosenthal

knowingly refused.  See supra.  More specifically, the Court finds that both the timing of and the

reason for AIG's request were reasonable, and that Rosenthal's refusal was willful and

unexcused.  See David, 2007 WL 4322792, at *3 ("The Massachusetts courts have held that if

one is requested, an Examination under Oath is a condition precedent—separate from the

condition precedent for a Proof of Loss—that must be satisfied prior to recovery[.] . . . [I]t was

entirely reasonable for [the insurer] to have requested that the plaintiffs submit to an

Examination under Oath.  Not only were the factual circumstances of the claim somewhat

suspicious, but in addition [the insurer's] repeated attempts to obtain documentary evidence from

the plaintiffs had been unsuccessful.  An Examination under Oath was a reasonable step to

collect additional information regarding the claim.  Having failed to comply with the condition

precedent of submitting to an Examination under Oath, the plaintiffs committed a material

breach of the Policy, and are therefore barred from recovery as a matter of law[.]").

Accordingly, Rosenthal breached the Policy.  See id.; Mello, 656 N.E.2d at 1250; Hanover Ins.

Co., 891 N.E.2d at 707.[17]

---

insured to comply with an insurer's timely request for an examination under oath.'"  Id. (quoting
Boffoli, 880 N.E.2d at 829).

[17] Even if AIG were required to show prejudice, it clearly could even though where prejudice has
been required, the "showing . . . is not, and should not be, easily made."  MetLife, 797 N.E.2d at
24.  In MetLife, which involved the insured stabbing another individual, the insured sat for an
EUO but refused to answer questions about the stabbing, invoking his Fifth Amendment right to
remain silent.  797 N.E.2d at 20.  The Massachusetts Court of Appeals Court found that the
refusal to answer questions about the stabbing was a breach of the duty to cooperate, and
prejudiced the insurer because the "refusal to disclose what happened on the night of [the
stabbing] necessarily kept from [the insurer] information that [the insured] alone was in a
position to provide and that was essential to sound coverage and defense decisions.  That is the
quintessence of prejudice."  Id. at 22–24.  Here, AIG argues that information relevant to the
Denver Action, including knowledge of the "watercraft involved," who had keys, and where they

C.      **Right to Cure**

Denver asks that even if Rosenthal breached his Policy, Rosenthal be allowed to sit for an EUO because that would "avoid prejudice, as a result of Rosenthal's refusal, to both Denver and to the passengers who were injured and – in one instance – died, as a result of the Accident and Rosenthal's negligence."  [ECF No. 28 at 2 n.1].

In response, AIG points to Miles v. Great Northern Insurance Co., where a different session of this court found that "[a]n insured's right to cure a breach of the duty of cooperation is limited in scope, particularly in cases of willful failure to submit to an examination under oath." 671 F. Supp. 2d 231, 240 (D. Mass. 2009), aff'd, 634 F.3d 61 (1st Cir. 2011); [ECF No. 29 at 3]. The refusal to sit for an EUO in Miles "resulted in a material dilution of [the insurance company's] rights," and there was "no legal or equitable basis on which to give the [insured] a second (or third) chance to comply with their contractual obligations."  671 F. Supp. 2d at 241. Similarly, in Rymsha v. Trust Insurance Co., the Massachusetts Appeals Court refused to allow an insured to cure a failure to cooperate, reasoning that it could "not see why [the insured] should be entitled to a judicial test-run on the issue of the reasonableness of [the insurer's] requests for information[.]"  746 N.E. 2d 561, 654–65 (Mass. App. Ct. 2001); [ECF No. 29 at 3].

Here, Rosenthal had multiple opportunities to agree to an EUO, but he persisted in his refusal.  See [DSOF ¶¶ 27–30; PSOF ¶¶ 32, 34, 37].  It would be unfair to AIG to allow an insured individual to deny its obligations under a policy unless and until AIG spent the time and resources necessary to litigate the issue.  Accordingly, the Court DENIES Denver's request to allow Rosenthal to cure his breach of the Policy.

---

were kept, is "peculiarly within Rosenthal's knowledge."  [ECF No. 20 at 6–7, 13–14].  The Court agrees, and thus would find that AIG was prejudiced by Rosenthal's refusal to sit for the EUO.

### D.      Additional Discovery

Denver next asks the Court to

give Denver leave to first conduct a Rule 30(b)(6) deposition of AIG:  (i) as to
AIG's efforts to obtain facts, other than through an EUO; (ii) as to the prejudice,
if any, suffered by AIG as a result of Rosenthal's refusal to submit to any EUO;
and/or (iii) as to AIG's knowledge of the facts it purports to seek through an
EUO, e.g.,: (a) the events on the Rosenthal Boat on the night of the Accident; and
(b) the facts relating to the Rosenthal Boat and its use that could implicate the
Watercraft Exclusion in the AIG Policy.

[ECF No. 28 at 3].

AIG argues in response that "[t]his apparent Fed. R. Civ. P. 56(d) request is deficient for

multiple reasons," including because

(a) . . . AIG's request for an EUO was reasonable under the circumstances; (b) AIG
is not required under Massachusetts decisional law to establish prejudice in order
to deny coverage based on Rosenthal's failure to submit to an EUO; and (c) the
requested evidence will not impact the applicability of the Intentional Acts
exclusion where it is based on the four corners of the Denver Action's Third-Party
Complaint and an objective reasonable person standard.  Thus, the Court should
deny Denver's request for discovery for all these reasons.

[ECF No. 29 at 4–5 (emphasis removed)].

Federal Rule of Civil Procedure 56(d) states the following:

When Facts Are Unavailable to the Nonmovant.  If a nonmovant shows by affidavit
or declaration that, for specified reasons, it cannot present facts essential to justify
its opposition, the court may:

(1) defer considering the motion or deny it;

(2) allow time to obtain affidavits or declarations or to take discovery; or

(3) issue any other appropriate order.

Fed. R. Civ. P. 56(d).

The Court sees no reason to permit the request for a deposition given its findings above

that Rosenthal breached the Policy and does not have a right to cure.  Accordingly, Denver's

request for additional discovery in this action is <u>DENIED</u>.

## IV.     CONCLUSION

Accordingly, Rosenthal's motion for summary judgement, [ECF No. 15] is <u>DENIED</u>, and AIG's cross-motion for summary judgment, [ECF No. 21], is <u>GRANTED</u> insofar as the Court finds that Rosenthal breached the Policy by failing to sit for an EUO.[18]  In addition, Denver's requests that Rosenthal be allowed to cure and for additional discovery are <u>DENIED</u>.

**SO ORDERED.**

March 12, 2024                                              */s/ Allison D. Burroughs*
                                                                ALLISON D. BURROUGHS
                                                                U.S. DISTRICT JUDGE

---

[18] Although the Court need not decide whether the Intentional Acts Exclusion bars coverage because it has already found that Rosenthal breached the Policy by failing to sit for an EUO and that he cannot cure the breach, <u>see</u> <u>supra</u>, it notes that it would likely find that AIG (1) has not met its burden to prove that coverage was precluded under the Intentional Acts Exclusion because it is disputed whether Rosenthal "knew to a substantial certainty that the bodily injury would result" from his actions, <u>Quincy Mut. Fire Ins. Co. v. Abernathy</u>, 469 N.E.2d 797, 800 (Mass. 1984); <u>see also</u> <u>Boyd v. Nat'l R.R. Passenger Corp.</u>, 845 N.E.2d 356, 363 (Mass. 2006) ("While negligence may result from 'inadvertence, incompetence, unskillfulness, or a failure to take [adequate] precautions,' recklessness 'requires a conscious choice of a course of action, either with knowledge of the serious danger to others involved in it or with knowledge of facts which would disclose this danger to any reasonable man.'" (quoting Restatement (Second) of Torts § 500 comment g, at 590 (Am. L. Inst. 1965)); and (2) had a duty to defend against the Third-Party Complaint because AIG could not "establish that the [Internal Act Exclusion] applies to all potential liability as a matter of law.'"  <u>Lionbridge Techs.</u>, 53 F.4th at 721 (quoting <u>Scottsdale Ins. Co.</u>, 913 F.3d at 228–29 (quoting <u>Norfolk & Dedham Mut. Fire Ins. Co.</u>, 958 N.E.2d at 862 (citation omitted))).